## STATE v. EMMA VOGES AND ANOTHER.[1]

April 3, 1936.

No. 30,610.

*Harry H. Peterson,* Attorney General, *Roy C. Frank,* Assistant Attorney General, and *J. Norman Peterson,* County Attorney, for the State.

*Phillips & Sherwood* and *Fred J. Hughes,* for defendant.

DEVANEY, CHIEF JUSTICE.

This case is here on a certified question.

Defendant Emma Voges and Tobias Voges, her husband, were indicted for first degree murder. On trial the jury returned a verdict of not guilty as to Tobias Voges and a verdict of guilty of manslaughter in the second degree as to Emma Voges. The district court stayed sentence and certified to this court the following question: "Did the evidence tend to show or prove facts constituting

[1]Reported in 266 N. W. 265.

the public offense charged in the indictment, or any lesser degree thereof?"

Defendants had living with them at their farm home, prior to and at the time of the events hereinafter related, their only child, Esther, an unmarried girl of about 20 years. During the month of December, 1934, Esther was observed by many to be pregnant. About ten o'clock on the evening of January 8, 1935, she became ill and remained so until eight o'clock the next morning. It is clear that her pains were those normally accompanying parturition. During the night she begged her mother to call a doctor, but defendant refused to do so, and the doctor was not called until noon the next day. Defendant remained in the same room with Esther all during the night of January 8-9, while Tobias Voges and one Walter Vanselow occupied a room adjoining Esther's.

On the afternoon of January 9 Esther was taken to a hospital, where she remained 11 days. After she had entered the hospital she was cared for by a nurse and a physician. The nurse owned and operated the hospital. In taking care of Esther the nurse worked with the doctor part of the time and otherwise worked independently of him.

Shortly after the date of the alleged birth, Esther and her mother were questioned as to what had become of the body of the baby. The answer was to the effect that they did not know "if they threw it in the stove, or in the toilet." When the sheriff searched the outhouse for the *corpus delicti*, defendant Emma Voges, when questioned respecting the body of the baby, gave contradictory and evasive answers. Later, among ashes taken from a stove in the room wherein Esther allegedly gave birth to the child, were found a small temporal bone and other unidentified pieces of bone, which according to the pathologist who testified for the state may have been the bones of a small child, infant, or of a small animal.

At the trial no evidence was offered on behalf of the defendants, and they did not take the stand. Esther and Walter Vanselow exercised their privilege against self-incrimination whenever any question material to the issue was put to them. Over objection, the nurse who attended Esther was permitted to testify that in her

presence a placenta was delivered from Esther by the doctor. She also testified that after the doctor left, as part of the hospital routine and not under the direction of the doctor, she examined, weighed, and measured the placenta; that the conditions which she found indicated this to be a normal birth; and in response to a question whether or not there was anything about the placenta by which she could tell whether the child had been born alive or dead, stated: "If the baby is a stillborn, it shows it has been dead for some time, unless it was hurt during the delivery from instruments, and where a baby is born dead there is usually some odor, or some defect with the placenta. Where there is a perfectly normal delivery there is none." She further stated that there was no odor or defect in this placenta. All this testimony was objected to on the ground that it violated 2 Mason Minn. St. 1927, § 9814, which protects the privilege existing between a doctor and his patient.

The nurse also was allowed to testify that Esther, while in the hospital, stated to her: "If I had known I was to have a baby I would have married Walter * * *. To think that my baby was born into this world without any clothes * * *. What will happen to babies when they are not baptized and they die?" This was objected to as hearsay.

The evidence, without considering the testimony objected to, clearly proves that a child was born to Esther sometime during the night of January 8-9. It may well be doubted whether the evidence as a whole, including the questionable testimony, establishes that the child was born alive. There is no direct evidence that anyone saw the child alive or dead. No body was found which would enable medical experts to determine whether life had existed in it independent of the mother. In that respect the instant case differs from State v. Sogge, 36 N. D. 262, 161 N. W. 1022, wherein the court held that the question of *corpus delicti* was for the jury when medical experts had examined the body of the child and had determined that it likely had lived several hours after birth. However, it is unnecessary to determine this question or to pass on any of the objections made to the testimony of the nurse. Assuming that all the testimony in the case was properly received and that it suffi-

ciently establishes that the child was born alive, the evidence is insufficient to justify a verdict of guilty of the offense charged in the indictment or any lesser degree thereof. Resolving all questions up to this point in favor of the state, there still remains one question: Was death caused by a felonious act or failure to act by any of the persons involved? The record does not contain an answer to this question. There is no evidence that the child did not die from natural causes or that its death was due to criminal neglect by defendants. Nowhere in the record is there any testimony showing the cause of death or the attendant circumstances. In every case of homicide a criminal agency must be shown. Without such proof a conviction of murder or manslaughter must be based on speculation and conjecture. The rule to which we adhere is succinctly stated in Underhill, Criminal Evidence (4 ed.) § 545:

"In homicide the necessary constituents of the corpus delicti, the death of a human being and that a criminal agency produced it, must be shown. * * * The burden is upon the state to prove each element of the corpus delicti beyond a reasonable doubt.".

There is no question that the defendant Emma Voges displayed a gross and culpable disregard of her duty to her daughter. But there is no evidence establishing or tending to establish that this conduct, however reprehensible it may be, was the cause of the child's death. Conjecture and speculation cannot take the place of proof.

The question certified is answered in the negative.

HILTON, JUSTICE (dissenting).

I dissent. The certified question should be answered in the affirmative. There are three elements which must be proved beyond a reasonable doubt in order to permit that answer. It must be shown: (1) That a child was born; (2) that it was born alive; and (3) the corpus delicti must be proved, which, according to the majority opinion, requires proof of death and the fact of criminal agency on the part of the defendant. These will be discussed in order. It is conceded that a child was born, so that element need not be considered.

The evidence would support a finding that a child was born alive. First, there is the testimony of the nurse. In addition to that set forth in the majority opinion, it was shown by her testimony that the placenta delivered from Esther was examined carefully by the nurse; its weight was one pound and five ounces, indicating a child weighing from five to six pounds; it measured six by nine inches, evidencing that a full-term child had been born; the umbilical cord attached thereto was 22 inches long; the average cord is 20 to 22 inches in length. This nurse was an expert, having had a great amount of obstetrical experience. She testified that only one child in 70 is born dead from a normal birth, and that the conditions which she found indicated a normal birth. Along with her testimony to the effect that in cases of normal delivery there is no odor or defect in the placenta, which was true here, this evidence alone appears amply sufficient upon which to base a finding that the child was born alive.

2 Mason Minn. St. 1927, § 9814, protecting the privilege existing between a doctor and his patient, cannot be used as a basis to exclude this testimony. The nurse testified from facts which she observed independently of her work with the doctor. Her observations were not the result of any order from the doctor, nor is there anything to indicate that the doctor even knew that the nurse was going to make those observations. The witness owned and operated the hospital. She was the only nurse employed therein. Everything she did, as far as her testimony goes, was at her own initiative. The statute referred to does not apply. Other states having statutes of like wording reach this result. Meyer v. Russell, 55 N. D. 546, 214 N. W. 857; Culver v. Union Pac. R. Co. 112 Neb. 441, 199 N. W. 794; Southwest Metals Co. v. Gomez (C. C. A.) 4 F. (2d) 215, 39 A. L. R. 1416; Borosich v. Metropolitan L. Ins. Co. 191 Wis. 239, 210 N. W. 829. This would seem to be the desirable rule. 12 Minn. L. Rev. 390, 396.

That testimony itself was sufficient to satisfy the requirement that there be proof that the child was born alive, but in addition to that there was the statement of Esther to the effect: "If I had known I was to have a baby I would have married Walter * * *.

What will happen to babies when they are not baptized and they die?" Obviously this could mean only that the baby was born alive and then died. The jury was justified 'in so finding. This testimony was objected to as hearsay. If so it was a statement against interest and as such admissible. It long has been the general rule in Minnesota and other states that any statement made by a third person, relevant to the matter in issue, is admissible in evidence in actions between other parties, when it appears that the declaration was against the declarant's pecuniary or proprietary interests at the time it was made, related to a matter of which he was personally cognizant, and that he had no probable motive to falsify and that the declarant is unavailable as a witness. Halvorsen v. Monn & Kerr Lbr. Co. 87 Minn. 18, 91 N. W. 28, 94 A. S. R. 669; 2 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934) § 3298; see 3 Wigmore, Evidence (2 ed.) § 1455, et seq. Where a statement is likely to result in criminal penalties on the part of the person making it, the statement is even more against the interests of the declarant than when it is against only his pecuniary or proprietary interests. Often such a statement might be against the declarant's pecuniary interests as well. An admission of having killed or injured a person, may, in some instances, result in the declarant having to respond in damages. Especially would this be true under the wrongful death statutes.

The declaration here was a statement against interest as subsequent events proved, for at the time of the trial Esther was in jail serving a sentence for concealing the birth. The statement could be construed as an admission that there had been a birth. It is held in many states that statements against interest are not admissible unless they are against the declarant's pecuniary or proprietary interests only. See 3 Wigmore, Evidence (2 ed.) § 1476. However, such restriction has been universally condemned. 1 Elliott, Evidence, § 434; 36 Harv. L. Rev. 481; 37 Id. 156; The Law of Evidence, Yale University Press, 1927; Thayer, Evidence, § 521; 3 Wigmore, Evidence (2 ed.) § 1477; People v. Toledo and Holgado, 51 P. I. 825. In the instant case there were ample safety factors. No reasonable mind would question the truthfulness of Esther's state-

ment. It was given under such circumstances as to preclude any possibility of fabrication. There is every reason to believe it. In a situation as this, where there is no chance of collusion, it has been held that such evidence is admissible. Brennan v. State, 151 Md. 265, 134 A. 148, 48 A. L. R. 342.

It is suggested that the rule of some jurisdictions that statements against interest are not admissible unless the declarant is dead, see 3 Wigmore, Evidence (2 ed.) § 1455, et seq., precludes the use of Esther's statement in this case. Esther was unavailable, in part, as a witness. She refused to testify to any matter material to the case, constantly exercising her privilege against self-incrimination. As held in Hines v. Commonwealth, 136 Va. 728, 117 S. E. 843, 35 A. L. R. 431, the requirement that the witness be unavailable before such statements are admitted thus was satisfied. There was just as much necessity for that evidence as there would have been had Esther died before the date of the trial. Such an occurrence would not have improved the evidence. In this case the testimony of the nurse and the statement of Esther both went to prove that the child was born alive. It should not be required in this kind of a case that the state obtain conclusive proof of life. Such a requirement is unreasonable. Beyond a reasonable doubt is all that is necessary. The evidence here and all the circumstances amply did that.

The next question has to do with the *corpus delicti*. There can be no doubt but that there was a death. The pathologist of whom the majority opinion speaks testified that the fragments of bone taken from the stove in the room where Esther gave birth to the child contained a temporal bone from a skull. The witness could not say positively that the bone was from the skull of a human being, but he was certain that it was not from the skull of a fowl or any such animal; that it might be from a human skull and that if it were it was from the skull of an infant or small child. In Underhill, Criminal Evidence (4 ed.) p. 1068, § 545, it is stated:

"If the circumstances point to the death of the person alleged to have been killed, the finding of fragments of a human body, or of tufts of hair * * * may be sufficient to establish the death."

Here the state has proved even more than that. In 2 Wharton, Criminal Evidence (11 ed.) p. 1505, § 871, it is said that in case of destruction of the body, or in case of its disappearance, death may be proved circumstantially. The testimony of the pathologist, when considered in the light of the statements made by defendant, which are set out in the following paragraph, certainly proves that there was a death.

The only other question is one of criminal agency. The defendant refused to call a doctor the night the child was born even though Esther implored her to do so and there was a telephone in the house. The defendant, probably in order to conceal evidence, attempted unsuccessfully to get the placenta from the hospital. Shortly after the date of the birth the defendant and Esther were being questioned as to what had become of the body. The answer was to the effect that they did not know "if they threw it in the stove, or in the toilet." Esther was not out of bed during the entire night. Quite obviously, then, she could not have committed that reprehensible act. The defendant was the only other suspected person who was a party to this conversation. The jury might well draw an inference from that. Circumstantial evidence may be used to prove criminal agency. 2 Wharton, Criminal Evidence (11 ed.) p. 1501, § 870. When the sheriff was searching an outhouse for the body the defendant stated that "she was afraid that the cats had got in there and ate up the body."

2 Mason Minn. St. 1927, § 10078, defines manslaughter in the second degree as homicide "committed without a design to effect death * * * by any act, procurement, or culpable negligence of any person, * * *." It may be manslaughter to omit to perform a legal duty. Especially is this true in cases of the failure of a parent or others charged with the custody and care of children or other helpless and dependent persons to provide shelter, food, or medical attendance. State v. Staples, 126 Minn. 396, 148 N. W. 283. Here the defendant not only was guilty of "culpable negligence" in omitting to perform her legal duty, but also was guilty of acts of commission which must have been the sole proximate cause of the death of the child.

I think the question should be answered in the affirmative, or, at. the very least, there should be a new trial.